IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LINDA F. McNEILL,
     Plaintiff,

vs.                                Case No. 3:10cv371/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY[1]

Plaintiff filed applications for DIB and SSI in April of 2003 and alleged disability beginning on January 27, 2003.  The applications were denied initially and on reconsideration.  On August 26,

---

[1] The procedural history of this case is derived from two decisions of the Administrative Law Judge ("ALJ"), dated August 26, 2005, and April 14, 2008, as well as the parties' briefs in support of their respective positions (Docs. 7, 16).

2005, following an administrative hearing, an ALJ rendered a decision in which he found Plaintiff disabled for a closed period, from January 27, 2003, through June 24, 2004, but not disabled after June 24, 2004.  In October 2005, Plaintiff requested review by the Appeals Council ("AC") of the ALJ's decision.  Additionally, in June 2006 Plaintiff protectively filed subsequent applications for DIB and SSI.

On June 13, 2007, the AC remanded Plaintiff's case to the ALJ for further review and consolidation of her 2003 and 2006 applications.  Following a second hearing, the ALJ issued a new decision dated April 14, 2008, in which he again found Plaintiff disabled from January 27, 2003, through June 24, 2004, but not disabled thereafter.  Plaintiff again sought review of the ALJ's decision by the AC, and she submitted additional evidence to the AC.  On July 26, 2010, the AC denied Plaintiff's request for review.  Thus, the decision of the ALJ dated April 14, 2008, stands as the final decision of the Commissioner, now subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity ("RFC") and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

III.     RELEVANT FACTUAL BACKGROUND, PLAINTIFF'S MENTAL HEALTH HISTORY, AND FINDINGS OF THE ALJ

A.      Plaintiff's Personal and Mental Health Treatment History

Plaintiff was born in 1950.  She alleges disability as of January 27, 2003, due to severe depression, anxiety, and certain physical impairments not at issue in this appeal (Tr. 114).[3]  Plaintiff has fourteen years of education and previously worked as a restaurant server/waitress, bartender, and landscaper (Tr. 135, 337).

In late 1999 Plaintiff obtained court-ordered substance abuse counseling at Lakeview Center, Inc. ("LCI"), an affiliate of Baptist Health Care, after she was charged with driving under the influence of alcohol (Tr. 168).  She returned to LCI on February 12, 2003, and stated she had been depressed for the past two months (Tr. 170).  She reported sleep disturbances, tearfulness, feelings of helplessness, and difficulty maintaining focus (id.).[4]  She also reported that she had additional difficulties related to financial problems, that "she had to quit her job because of [her] physical problems," and that pain interferes with her ability to perform certain daily activities (see Tr. 170).  Plaintiff was assessed by a licensed clinical social worker with major depressive disorder, recurrent,

---

[3] All references to "Tr." refer to the transcript of Social Security Administration record filed on December 8, 2010 (Doc. 7).

[4] Although the file contains no mental health records dated before 1999, when Plaintiff presented to LCI in February 2003 she reported prior treatment for depression in 1996 at a crisis stabilization unit ("CSU") (presumably, the CSU at LCI), following a suicide attempt by overdose (Tr. 170).  She stated she remained in treatment through 1998, when she felt stable enough to discontinue medication use (id.).  In October 1999, however, she reported to LCI staff that "she has never been suicidal, but only depressed" (Tr. 175).

with a global assessment of functioning ("GAF") score of 40,[5] and she was referred to the psychiatry department for further evaluation (Tr. 171).

On February 26, 2003, Plaintiff was admitted to the CSU at LCI under the Baker Act (Florida's involuntary mental health treatment law, Fla. Stat. Chap. 394, Part I) after she called 911 and threatened to commit suicide (Tr. 176). Plaintiff was discharged on March 5, 2003, by Kaberi Samanta, M.D., a psychiatrist, with prescriptions for Prozac and Trazodone (*id.*). Dr. Samanta recommended follow-up treatment at LCI and outpatient substance abuse counseling (*id.*). Plaintiff was assessed with depressive disorder, not otherwise specified ("NOS"); rule out major depression, recurrent; alcohol abuse; and a GAF score of 45–50 (Plaintiff's GAF score upon admission was 40) (*see* Tr. 176, 178). On March 10, 2003, Dr. Samanta noted that Plaintiff was alert, oriented, and "mildly anxious but otherwise [had a] brighter affect," although Plaintiff reported bothersome side effects from one or both of her medications, so they were adjusted (Tr. 210–11). Dr. Samanta's diagnoses remained the same, but Plaintiff's GAF score was increased to 55 (Tr. 211). Plaintiff returned to Dr. Samanta in April, June, August, and December of 2003 (Tr. 206–09). Plaintiff's diagnoses and GAF score (55) remained the same, although she reported varying degrees of anxiety and depression, and her mood and affect varied (*see id.*).

Plaintiff attended outpatient counseling sessions at The Christian Counseling Center, an affiliate of Baptist Health Care, on approximately fifteen occasions between November 2003 and May 2004 (Tr. 218–21, 296–309). At Plaintiff's first visit, K. Alesia Willis, a licensed mental health counselor ("LMHC"), interviewed Plaintiff about her mental health and related symptoms and

---

[5] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 31 and 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). *Id.* A score between 41 and 50 reflects <u>serious</u> symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A score between 51 and 60 reflects <u>moderate</u> symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

thereafter assessed a GAF score of 30–35, in addition to diagnosing major depression (Tr. 306–09).[6]
The additional handwritten records largely reflect Plaintiff's descriptions of her mood and feelings,
as well as the counselors' suggested coping techniques (*see* Tr. 218–21, 300).  Although Plaintiff
continued to report depression, anxiety, and related symptoms (*see, e.g.*, Tr. 301, 303), in April 2004
LMHC Willis assessed a GAF score of 63 (Tr. 298).  At Plaintiff's last visit, in May 2004, she saw
a mental health counselor intern, who noted that Plaintiff was "having a good day" and "works better
under pressure," although Plaintiff reported "depression on a daily basis" (Tr. 296–97).

 Records from Robert D. Flurry, M.D., reflect that he treated Plaintiff from January 27, 2003,
through July 20, 2004[7] (*see* Tr. 222, 224, 280–82, 467–72).  Although Dr. Flurry primarily treated
Plaintiff for physical conditions (*see, e.g.*, Tr. 282), his records reflect occasional diagnoses of major
depression or depression and/or generalized anxiety disorder, as well as his prescribing medications
for these conditions (*see, e.g.*, Tr. 281, 280, 470, 472).

 Records from Escambia County Health Department reflect that Plaintiff was treated for
various physical conditions between July 11, 2001, through April 29, 2005 (Tr. 473–88).  At each
visit, mental status assessments yielded "normal" results (*see* Tr. 483 (July 2001); Tr. 479 (August
2002); Tr. 477 (March 2004); Tr. 473, 475 (April 2005)).

 On or about June 25, 2004, Plaintiff's case was transferred from Dr. Samanta to Cynthia
Javellana, M.D. (a staff psychiatrist at LCI), and Plaintiff first presented to Dr. Javellana on that date
(Tr. 310).  Dr. Javellana interviewed Plaintiff, adjusted her medications, and assessed depressive
disorder NOS, "rule out major depressive disorder recurrent with anxiety symptoms," "alcohol
abuse, rule out dependence, in partial remission," and a GAF score of 55 to 60 (*id.*).  Dr. Javellana
recommended that Plaintiff return in two to three months (*id.*).  It appears that Plaintiff returned on
August 9, 2004, and saw an assistant to Dr. Javellana (*see* Tr. 330).  Plaintiff requested adjustments
to her medications, which Dr. Javellana apparently approved, and—it appears—the assistant
assessed a GAF score of 55 (*id.*).  Plaintiff returned in September 2004 and again apparently saw

---

  [6] During this visit Plaintiff advised LMHC Willis that she had no money, had been turned down for SSI, and
her financial situation was contributing to her mental health problems (*see* Tr. 309).

  [7] The file contains earlier-dated treatment records from Dr. Flurry (*see, e.g.*, Tr. 280–95 (reflecting occasional
treatment between November 1992 and January 2003)), but the earlier records are of little relevance because they
concern treatment prior the date Plaintiff alleges she became disabled.  Moreover, the records primarily concern physical
ailments not at issue in this appeal.

an assistant "in collaboration with" Dr. Javellana (*see* Tr. 328).  Plaintiff reported being "very stable" on the current medication regimen, and she described no "depressive symptomatology" (*id.*). Plaintiff stated she had recently run out of two of her medications and that when she ran out she noticed increased anxiety (*id.*).  Plaintiff was assessed with depressive disorder, recurrent, with anxiety symptoms, and a GAF score of 60 (*id.*).  Notes from October 2004 reflect a GAF score of 60, and from November 2004 a GAF score of 55 to 60 (Tr. 326–27).  The November notes also reflect Dr. Javellana's observation that Plaintiff was "mildly" anxious and depressed (Tr. 326).  In February 2005 Plaintiff returned and apparently saw an assistant, who assessed dysthymic disorder, chronic, with anxiety symptoms; mood disorder secondary to multiple medical problems; and a GAF score of 50 (Tr. 324).  In March 2005 Plaintiff told Dr. Javellana she was "feeling fine" and "doing better," although she was feeling some stress (Tr. 598).  Dr. Javellana observed that Plaintiff appeared to be in good spirits, and her mood was euthymic (*id.*).  Plaintiff denied any acute psychotic symptoms, delusions, or paranoia (*id.*).  Dr. Javellana maintained Plaintiff on her current medications (i.e., Lexapro, Effexor XR, Seroquel, and Ativan), and she assessed dysthymic disorder, chronic with anxiety symptoms; mood disorder secondary to multiple medical problems; and a GAF score of 60 to 62 (*id.*).  In May 2005 Plaintiff told Dr. Javellana she was feeling down, struggling with depression, and experiencing a lot of stress because a friend with leukemia was not doing well (Tr. 597).  Plaintiff appeared anxious, irritable, and depressed (*id.*)  Plaintiff's diagnoses and medications remained the same, but a GAF score of 58 was assessed (*id.*).  Plaintiff returned to Dr. Javellana's office in September and October of 2005; February, June, and October of 2006; and February of 2007 (Tr. 591–96).  The treatment notes largely reflect Plaintiff's subjective complaints and reported symptoms, essentially consistent diagnoses, continuation or slight modification of Plaintiff's medication regimen, and the assessment of GAF scores of 52, 53, or 55 (*see id.*).[8]  On July 18, 2007, Dr. Javellana completed a form for the Escambia County Workfare Program, on which she indicated that Plaintiff was temporarily unable to work (i.e., for a period of one year) (Tr. 648). A question on the form asked, "If unable to work, please explain limitations," but Dr. Javellana did not provide an explanation (*see id.*).

---

[8] The ALJ's opinion includes a very thorough description of these treatment notes (*see* Tr. 40–45), which need not be repeated here.

Finally, Plaintiff received treatment at the Escambia Community Clinic on numerous occasions between November 2004 and January 2007 (*see* Tr. 312–23, 552–90).  Throughout these numerous medical records, Plaintiff's mental status is consistently described as "normal" or "alert," and/or Plaintiff is noted to be cooperative, in no acute distress, and oriented (*see, e.g.*, Tr. 312, 316, 319, 323, 557, 560, 563, 567, 571, 573, 574, 577, 581, 586).

B.      Opinions of Examining and Non-Examining Agency Psychologists

1)  Examining Agency Psychologist

On January 21, 2004, Plaintiff was evaluated by Susan A. Danahy, Ph.D., at the request of the Office of Disability Determinations ("ODD") (Tr. 213).  After interviewing Plaintiff about her personal and medical history Dr. Danahy conducted a mental status evaluation, the results of which—with one exception—were essentially normal (e.g., Plaintiff was an adequate historian; her ability to form rapport was normal; she displayed normal insight, intellectual functioning, and thought processes; and she displayed no evidence of hallucinations or delusions) (Tr. 215).  The one exception is as follows:  Dr. Danahy stated that Plaintiff came across as very, very depressed and cried throughout much of the interview (*id.*).  Dr. Danahy assessed major depression, severe recurrent; possible pain disorder with severe depression; panic disorder without agoraphobia; and a GAF score of 50 (Tr. 216–17).  Additionally, she opined that Plaintiff "would qualify for almost any Axis I affective diagnosis, i.e., anxiety or depression" (*id.*).

2)  Non-Examining Agency Psychologists

Plaintiff's file contains the opinions of four non-examining agency psychologists, rendered on five different occasions: June 2003 (J. Patrick Peterson, Ph.D., J.D.), February and August 2004 (Jane F. Cormier, Ph.D.), September 2006 (Martha Putney, Ph.D.), and February 2007 (Judith Meyers, Psy.D.) (Tr. 179–92, 226–29, 238–51, 522–36, 599–613, respectively).  In summary, these agency consultants opined that Plaintiff had certain non-severe mental impairments—including depression, personality disorder, substance abuse disorder, and chronic dysthymia with anxiety—which resulted in no more than one episode of decompensation and no more than mild or moderate mental limitations, none of which met or equal a listed impairment (*see id.*).

C.      Findings of the ALJ

The ALJ determined that Plaintiff was disabled from January 27, 2003, through June 24, 2004, due to an inability to perform the mental demands of unskilled work after being hospitalized

for suicidal threats (Tr. 46).  As of June 25, 2004, however, Plaintiff's mental impairments caused no restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation; therefore, her mental impairments were no longer severe (Tr. 49).  The ALJ also found that as of June 25, 2004, Plaintiff retained the RFC to perform light work and could perform her past relevant work as a waitress (Tr. 54).  Thus, from that day forward Plaintiff could perform the physical and mental demands of unskilled work and was not disabled.[9]

IV.     PLAINTIFF'S CLAIMS FOR RELIEF (as rearranged by the undersigned)

   A.     Claim One:  The ALJ failed to follow the Appeals Council's order to obtain evidence from a psychiatric medical expert (Doc. 13 at 10).

       As previously noted, following the first decision of the ALJ the AC remanded Plaintiff's case for further proceedings.  In relevant part the remand order directed the ALJ to "obtain evidence from a psychiatric medical expert to assist in a longitudinal assessment of [Plaintiff's] mental impairment . . ." (Tr. 362).  Plaintiff contends the ALJ did not follow this directive because he "did not request evidence from any psychiatric medical expert" and "instead discredited Dr. Javellana's opinions . . . and accorded substantial weight" to other opinions in the record, none of which were rendered by "psychiatric medical experts" (Doc. 13 at 10) (emphasis in original).  Plaintiff thus appears to suggest that the ALJ could comply with the AC's directive only by soliciting an opinion from a psychiatrist or, alternatively, by accepting the opinions of Dr. Javellana, who is a psychiatrist. Plaintiff, however, has construed the directive of the AC too narrowly.

       It is evident that the AC determined that the record lacked "longitudinal" evidence of Plaintiff's mental health condition and related treatment.  The AC also determined that the "record was poorly developed and that much of the evidence predates" January 27, 2003, the date Plaintiff alleges she became disabled (Tr. 361).  The ALJ was therefore directed to obtain evidence reflecting Plaintiff's mental health condition after January 2003, as well as evidence that reflected Plaintiff's treatment over a longer period of time.  Consistent with these directives the record was expanded

---

[9] *See* Social Security Ruling ("SSR") 85-15 (noting that basic mental demands of competitive, unskilled work include abilities to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting).

to include additional treatment records from Dr. Flurry and LCI/Dr. Javellana.[10] The ALJ also obtained opinions from two agency psychologists, both of whom completed Psychiatric Review Technique forms ("PRTFs") (*see* Tr. 522–36 (PRTF reflecting Plaintiff's condition through September 21, 2006) and Tr. 599–613 (PRTF reflecting Plaintiff's condition through February 13, 2007)).  This evidence sufficiently completed the record and complied with the directives of the AC's remand order, as it reflects Plaintiff's "psychiatric" condition over a period of several years following the date she alleges she became disabled.  Plaintiff, therefore, is not entitled to relief on this ground.

      B.      Claim Two:  The ALJ improperly attributed no weight to Dr. Javellana's opinions (Doc. 13 at 4).

      C.      Claim Three:  The ALJ erred in concluding that Plaintiff's disability ended as of June 24, 2004 (Doc. 13 at 13–15).

Plaintiff's next two claims are considered together because they are related.  As noted *supra*, Dr. Javellana began treating Plaintiff on June 25, 2004, and the ALJ concluded that Plaintiff was not disabled as of that date.  Additionally, as previously discussed, on July 18, 2007, Dr. Javellana completed a form, on which she checked a box indicating that Plaintiff was unable to work (Tr. 648).  On the same form she checked a box indicating that Plaintiff's condition was "temporary," and she filled in a blank stating that the temporary time frame was "1 year" (*id.*).  Plaintiff claims the ALJ erred in rejecting the opinions on the form and in finding Plaintiff not disabled as of June 25.

As this court is well aware, substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).

---

[10] Prior to remand Plaintiff's file contained treatment records from Dr. Flurry through January 2004, and from LCI/Dr. Javellana through May 2005 (*see, e.g.*, Tr. 3–4, 324–32).  Following remand Plaintiff's file contained treatment records from Dr. Flurry through July 2004, and from LCI/Dr. Javellana through September 2007 (*see, e.g.*, Tr. 7–8).

The ALJ afforded no weight to the opinions on the form dated July 18, 2007, because he found, generally, that the opinions were conclusory and inconsistent with Dr. Javellana's treatment records.  More specifically, the ALJ noted—correctly—that Dr. Javellana  failed to fully complete the form (the form stated, "[i]f unable to work, please explain limitations," but Dr. Javellana left this portion of the form blank), and she provided no diagnosis or explanation for her opinions (*see* Tr. 45, 648).  Indeed, Dr. Javellana failed to explain why Plaintiff's condition was temporary or why she determined that Plaintiff was unable to work during the specific time frame of mid-July 2007, through mid-July 2008 (*see* Tr. 648).[11]  Thus, the ALJ did not err in rejecting the opinions because he identified a proper basis for rejecting them, and the basis is fully supported by the record.

As to the ALJ's latter finding, the ALJ summarized Dr. Javellana's treatment records in great detail and then concluded that, overall, her treatment records were inconsistent with her opinions on the form and with a finding of "disabled" after June 24, 2004 (*see* Tr. 40–45, 48).  Among other inconsistencies, the ALJ pointed to the following entries in Dr. Javellana's records: 1) on June 25, 2004, Dr. Javellana reported that Plaintiff was pleasant and cooperative, quite verbal and logical, and she remained goal directed, with no evidence of acute psychotic symptoms; Plaintiff denied suicidal ideation or intent, as well as homicidal thoughts; and Plaintiff's cognitive function was within normal range (Tr. 48; *see also* Tr. 331); and 2) on March 28, 2005,[12] Plaintiff told Dr. Javellana she was "doing better" and "feeling fine"; she denied any acute psychotic symptoms, delusions, or paranoia; her insight and judgment were adequate; Dr. Javellana indicated that Plaintiff appeared to be in good spirits, and her mood was euthymic; and Dr. Javellana assessed a GAF score 60 to 62, reflecting only mild symptoms (Tr. 40; *see also* Tr. 598).  The ALJ continued by noting similar entries in Dr. Javellana's records from the remainder of 2005, as well as 2006 and 2007 (*see*

---

[11] It should noted that no evidence in the record before the ALJ suggests Plaintiff was "disabled" from June 25, 2004, through July 18, 2007, the day Dr. Javellana completed the form.  For example, no treating, examining, or non-examining specialist—including Dr. Javellana—opined that Plaintiff was "disabled" during that time frame; nor did any such specialist impose functional limitations, hospitalize Plaintiff, or recommend more intensive or more frequent therapy.

[12] The ALJ did not specifically mention Plaintiff's additional visits in 2004.  However, it is worth noting that during that time Plaintiff reported being "very stable" on her current medication regimen, she described no "depressive symptomatology," and a GAF score of 60 was assessed (Tr. 328 (September 2004)); in October and November 2004 GAF scores of 60 and "55 to 60," respectively, were assessed (Tr. 326–27); and in November 2004 Dr. Javellana commented that Plaintiff was only "mildly" anxious and depressed (Tr. 326).

Tr. 40–43).  The ALJ also acknowledged certain entries in Dr. Javellana's records that reflect deterioration in Plaintiff's condition at various times after June 2004 (e.g., Plaintiff's reports of worsening symptoms, Dr. Javellana's assessments of lower GAF scores), but the ALJ noted that on these occasions Plaintiff was troubled by a particular event in her life, that Dr. Javellana made no adjustment to Plaintiff's medications, that Dr. Javellana did not hospitalize Plaintiff, and/or that Dr. Javellana did not direct that Plaintiff return to see her more frequently.  For example, the ALJ noted that in late May 2005 Dr. Javellana reported that Plaintiff was anxious, irritable, and depressed, her affect was constricted, and she felt frustrated and helpless (Tr. 40).  The ALJ noted, however, that Plaintiff was then under a lot of stress because a friend had leukemia and was not doing well (*id.*). The ALJ also noted that at the same visit Dr. Javellana characterized Plaintiff's insight and judgment as "fair," she made no changes to Plaintiff's medication regimen, and Plaintiff was not expected to return for approximately three months (Tr. 40; *see also* Tr. 597).  Additionally, the ALJ pointed out that just four days before this May visit, a physician at the Escambia Community Clinic described Plaintiff as alert, cooperative and oriented, with a "normal" mental status (Tr. 40 (referencing Tr. 586–88)).  Similarly, with regard to a June 2006 visit, Plaintiff reported more severe symptoms due in part to pain and other physical ailments, and she stated she felt very frustrated and helpless (*see* Tr. 42, 593).  Although Dr. Javellana reduced Plaintiff's GAF score at this visit to 52 (moderate symptoms), she also stated that Plaintiff was only "mildly" anxious (Tr. 42 (referencing Tr. 593)). The ALJ noted, as he did with regard to the May 2005 visit, that Dr. Javellana did not hospitalize Plaintiff, she maintained Plaintiff's medication regimen, and she advised Plaintiff to return in four months (*id.*).  These actions by Dr. Javellana, the ALJ concluded, are "hardly suggestive of an ongoing severe mental condition" (Tr. 42).  Moreover, the ALJ noted, during the same time physicians at the Escambia Community Clinic consistently opined that Plaintiff's mental status was normal (*see id.*).  Further, the record reflects that in September 2007, just two months after completing the form, Dr. Javellana diagnosed Plaintiff with mild depression, described her cognitive functioning as "within normal range," described her insight as "fair," maintained her current medication regimen, and advised Plaintiff to return in three to four months (Tr. 660).  Dr. Javellana made similar entries in her treatment records from January 2008 (*see* Tr. 659).

     The ALJ also discussed the varying GAF scores assessed by Dr. Javellana.  More specifically, the ALJ noted that since June 25, 2004, Dr. Javellana assessed GAF scores ranging

from 52 (moderate symptoms) to 62 (mild symptoms), but he accorded no weight to these assessments (Tr. 48).  The ALJ did not err in doing so.  GAF scores have no "'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 Fed. Appx. 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000) (wherein the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings.")); *see also* Camp v. Barnhart, 103 Fed. Appx. 352, 354 (10th Cir. 2004) (a GAF score, without evidence that it impaired the ability to work, does not establish an impairment).  Even if the GAF scores are considered, however, the scores assessed by Dr. Javellana on or after June 25, 2004, weigh against a finding of disability, as they fail to establish that Plaintiff's mental impairments imposed serious limitations for a continuous twelve-month period, as required for a finding of disability.  *See* 42 U.S.C. § 1382c(a)(3)(A).  Indeed no score assessed in this time frame falls within the "serious symptom" range of 41–50; rather, all scores reflect either mild or moderate symptoms.

Finally, in finding Plaintiff "not disabled" as of June 25, 2004, the ALJ reiterated that the Escambia Community Clinic physicians repeatedly and consistently assessed Plaintiff's mental status as "normal," as did physicians at Baptist Hospital (Tr. 49 (referencing, in part, Tr. 492, 504, 505, 513, 520)).  The ALJ also relied on the PRTFs completed by Dr. Putney in September 2006 and Dr. Meyers in February 2007 (Tr. 49).  These agency specialists both opined that Plaintiff had no more than mild functional limitations (*see* Tr. 532, 609).  Dr. Putney based her opinions, in part, on evidence in the record concerning Plaintiff's ability to perform a variety of daily activities (i.e., prepare meals, shop, care for herself, perform household chores, manage money, and drive), the normal results of Plaintiff's mental status examinations, and Plaintiff's own reports that she got along well with others, had never been fired, and had no deficits with regard to "I.Q." or education (Tr. 534).  In forming her opinions Dr. Meyers considered, among other evidence, Plaintiff's daily activities and Dr. Javellana's records and statements (*see* Tr. 611 (referencing, for example, Javellana's opinion that Plaintiff had normal cognitive functioning)).  *See* Wind, 133 Fed. Appx. at 692 (ALJ properly considered that "Dr. Javellana's September 2000 assessment was contradicted by Wind's own statements to the examining physicians that she volunteered at her church,

straightened the house, performed household chores, made handicrafts, painted, visited yard sales, read, and watched television") (citing Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987)).

In summary, the ALJ did not err in rejecting the opinions on the form completed by Dr. Javellana in July 2007. Moreover, he properly concluded—based on Dr. Javellana's own treatment notes, as well as other, substantial evidence in the record—that Plaintiff was not disabled after June 24, 2004. Accordingly, Plaintiff is not entitled to relief on this claim.

D.      Claim Four:  The Appeals Council failed to properly consider evidence presented to it in connection with Plaintiff's request for review (Doc. 13 at 8–9, 10–13).

Following the ALJ's decision dated April 14, 2008, Plaintiff submitted additional evidence to the AC in connection with her request for review. This evidence includes treatment records from LCI/Dr. Javellana, dated September 14, 2007, through February 16, 2009 (Tr. 652–61), and a Mental Impairment Questionnaire ("MIQ") completed by Dr. Javellana on February 13, 2009 (Tr. 662–69). On July 26, 2010, the AC denied Plaintiff's request for review (Tr. 9). In its notice denying review, the AC specifically noted that it had considered  the new evidence presented by Plaintiff, as well as the reasons Plaintiff disagreed with the ALJ's decision, as presented in a letter from Plaintiff's counsel dated June 11, 2009 (see Tr. 9–12, 15–25). The AC concluded, however, that the new information provided no "basis for changing the [ALJ's] decision" (Tr. 10). The AC thus did not err by failing to consider the new evidence. See Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994). Moreover, to the extent Plaintiff contends the AC was required to explain its denial of review (see Doc. 13 at 12–13), the contention fails. See Burgin v. Comm'r of Social Sec., 420 Fed. Appx. 901, 903 (11th Cir. 2011) ("The AC considered and incorporated the additional evidence submitted by Burgin into the record. Contrary to Burgin's argument, the AC was not required to explain its denial of review.") (citing Ingram, 496 F.3d at 1261). This court must therefore determine whether the "new evidence renders the denial of benefits erroneous." Ingram, 496 F.3d at 1262. Accordingly, the new evidence submitted by Plaintiff will be summarized before addressing the merits of Plaintiff's claim.

Treatment Records

Only two of the new treatment records concern treatment prior to April 14, 2008, the date of the ALJ's decision; therefore, they are the only records properly considered in connection with this claim. See 20 C.F.R. 404.970(b) (AC must "evaluate the entire record including the new and

material evidence submitted <u>if</u> it relates to the period on or before the date of the administrative law judge hearing decision") (emphasis added); *see also, e.g.*, <u>Smith v. Social Security Admin.</u>, 272 Fed. Appx. 789, 800–02 (11th Cir. 2008) (finding no error in AC's decision not to review the ALJ's decision where new evidence was not new and material and/or did not relate to the period on or before the ALJ's decision).  The first treatment record, dated September 24, 2007, is similar to Dr. Javellana's earlier treatment records.  For example, Plaintiff reported experiencing stress due to physical problems and a close friend's illness (Tr. 660).  Dr. Javellana noted that Plaintiff was "pleasant and cooperative," and although she was "irritable and downcast" she denied any acute psychotic symptoms, suicidal ideation, or suicidal intent (*id.*).  Plaintiff's cognitive functions were "within normal range," and her insight and judgment were "fair" (*id.*).  Additionally, Dr. Javellana made no changes to Plaintiff's medication regimen (except for adding of a low dose of Elavil to help Plaintiff sleep), Plaintiff was directed to return in three to four months, and a GAF score of 52 was assessed (*id.*).  The second treatment record, dated January 14, 2008, is essentially the same, although a GAF score of 53 was assessed  (*see* Tr. 559).

<u>Mental Impairment Questionnaire</u>

As noted, Dr. Javellana completed the MIQ on February 13, 2009.  In short, she rendered opinions on this form which, if accepted as true, would render Plaintiff disabled as of June 25, 2004. For example, Dr. Javellana opined that Plaintiff had "marked" functional limitations, "frequent" deficiencies in concentration, persistence or pace, and "continual" or "repeated" episodes of decompensation; she also opined that Plaintiff was unable to work and had been unable to work since June 25, 2004 (*see* Tr. 662, 664, 668).

<u>Discussion</u>

With regard to the additional treatment records, the undersigned has no hesitation in concluding they would not change the administrative outcome.  As explained *supra*, the records are different in no material way from the numerous records previously considered by the ALJ. Therefore, the records create no "reasonable possibility" of a different result.  <u>Smith</u>, 272 Fed. Appx. at 800–01 (citing <u>Milano v. Bowen</u>, 809 F.2d 763, 766 (11th Cir. 1987)).

While it is a closer question with regard to the MIQ (which is dated after the date of the ALJ's decision but purports to relate to Plaintiff's condition since June 2004), the undersigned

concludes it would not change the administrative outcome.  First and most important, the MIQ is not supported by Dr. Javellana's treatment records, including those records considered by the ALJ and those submitted to the AC.  For the same reasons previously articulated by the ALJ, the records—and the course of treatment documented therein—are "hardly suggestive of an ongoing severe mental condition" (Tr. 40); they are also inconsistent with the disabling limitations listed on the MIQ.  Thus, as with Dr. Javellana's earlier opinions, good cause exists for rejecting her opinions on the MIQ.  *Cf.* Flowers v. Comm'r of Social Security, No. 11-11321, 2011 WL 4509878, at *8–9 (11th Cir. Sept. 30, 2011) (AC erred in denying review where new evidence included an RFC assessment, prepared by the claimant's treating physician, that was supported by significant clinical findings from three examinations performed over a ten-month period; thus, "unlike the earlier, discounted RFC assessments, [the same treating physician's new] assessment . . . is supported by her clinical findings from the [three] examinations).

Furthermore, some opinions on the MIQ are inconsistent with the record.  For example, Dr. Javellana stated on the MIQ that she reviewed "all of [Plaintiff's] records from her treatment at Lakeview"; immediately thereafter she opined that Plaintiff's condition has "remained the same or [has been] substantially similar since she began treating at Lakeview" (Tr. 662) (emphasis added). The record, however, establishes that in February 2003 LCI staff assessed a GAF of 40, and Plaintiff was involuntarily committed to LCI under the Baker Act.  Indeed, based in part on this evidence Plaintiff was deemed disabled for a closed period.  Moreover, Plaintiff's condition improved during and following her release from the Baker Act commitment, as documented by Dr. Samanta's treatment notes through the time Dr. Javellana took over Plaintiff's care.  Thus, the opinion on the MIQ that Plaintiff's condition has never changed while under LCI's care is clearly refuted by the record.  Likewise, some opinions on the MIQ are inconsistent with the opinions Dr. Javellana offered on the form she partially completed in July 2007.  On the MIQ Dr. Javellana opined, essentially, that Plaintiff was disabled and had been disabled since June 25, 2004 (*see* Tr. 662–68), but in July 2007 Dr. Javellana opined that Plaintiff was "temporarily" disabled for a period of only one year.  Further, Dr. Javellana opined on the MIQ that certain medication side effects "may have implications for working," and she listed a host of possible, disabling, side effects (*see* Tr. 665).  Dr. Javellana's records, however, do not reflect complaints of such disabling side effects or substantial adjustments to Plaintiff's medication regimen due to such side effects.  And, even though the MIQ

is more thorough than the form Dr. Javellana completed in July 2007, it nevertheless lacks appropriate explanations for the opinions.  For example, Dr. Javellana stated on the MIQ that Plaintiff "is not capable of obtaining or maintaining employment due to her level of anxiety, depression, and chronic pain" (*see* Tr. 662).  However, Dr. Javellana did not explain to what extent Plaintiff's chronic pain affected her overall conclusion that Plaintiff is unable to work (Dr. Javellana is a psychiatrist, not a chronic pain specialist, and there is no indication she reviewed any of Plaintiff's medical records or based her opinion on anything other than Plaintiff's subjective complaints of pain).  And, as previously noted, in her treatment records Dr. Javellana consistently characterized Plaintiff's anxiety as mild.

Finally, it is worth noting that the additional treatment records submitted by Plaintiff that post-date the ALJ's decision, also undermine the opinions on the MIQ.  In brief, on April 22, 2008, Dr. Javellana assessed a GAF score of "50–52" after Plaintiff reported being "so" depressed and "very disappointed that her disability appeal ha[d] been turned down" (Tr. 657).  Nevertheless, Dr. Javellana continued Plaintiff on the same medications (except for one, which was discontinued because Plaintiff had not been taking it) and directed that Plaintiff return in three to four months (*see id.*).  The treatment notes from July 2008 are similar, and even though Plaintiff was assessed with a GAF score of 50 (serious symptoms), Dr. Javellana advised Plaintiff to return in four to five months (Tr. 655).  And at Plaintiff's next visit, in November 2008—just two and half months before Dr. Javellana completed the MIQ—Dr. Javellana noted that Plaintiff was in good spirts, Plaintiff was quite verbal, animated, alert and oriented, and Dr. Javellana assessed a GAF score of "55–60" (Tr. 654).  These observations are inconsistent with the "marked" functional limitations assessed by Dr. Javellana on the MIQ.

For all of these reasons, the undersigned concludes there is no "'reasonable possibility that [the new evidence] would change the administrative result.'"  Robinson v. Astrue, 365 Fed. Appx. 993, 996 (11th Cir. 2010) (quoting Milano, 809 F.2d at 766); *see also* Keene v. Astrue, No. 5:09cv192/SPM/WCS, 2010 WL 2404421, at *14–16 (May 20, 2010) (new evidence submitted by a claimant's treating physician to the AC did not render the ALJ's prior denial of benefits erroneous) (*report and recommendation adopted*, Keene v. Astrue, 2010 WL 2404397 (N.D. Fla. Jun 16, 2010)).  Accordingly, the Appeals Council did not err in denying review or in failing to remand Plaintiff's case to the ALJ to consider the new evidence.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>1</u><sup>st</sup> day of November 2011.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**